# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

JERRY DAVID AGUILAR,

    Plaintiff,

v.

BATES, et al.,

    Defendants.

Case No.: 3:15-cv-02446-MMA-AGS

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

[Doc. No. 74]

Plaintiff Jerry David Aguilar, a California state prisoner proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983 against five medical professionals at R. J. Donovan Correctional Facility in San Diego, California, alleging violations of his Eighth Amendment right to adequate medical care. Defendants move for summary judgment as to Plaintiff's claims. *See* Doc. No. 74. Plaintiff filed a response in opposition to the motion, to which Defendants replied. *See* Doc. Nos. 87, 89. The Court granted Plaintiff leave to file a sur-reply. *See* Doc. No. 92. For the reasons set forth below, the Court **GRANTS** Defendants' motion for summary judgment.

1

3:15-cv-02446-MMA-AGS

## BACKGROUND

This action arises out of events occurring at R. J. Donovan Correctional Facility ("RJD") beginning on or about November 5, 2014.[1] On that date, at some time between 3:00 p.m. and 3:40 p.m., Plaintiff injured his right ankle while playing handball. Plaintiff reported to his facility's medical clinic, and was transported via wheelchair to RJD's Triage and Treatment Area ("TTA"). Plaintiff's injury was categorized as "urgent," and he received immediate treatment upon his arrival at TTA. Doc. No. 74-2 at 105.[2] Plaintiff reported feeling pain at a level 9 on a scale of 0 to 10. The triage nurse administered 600 milligrams of ibuprofen and initiated ice compression. Defendant Bates, the TTA physician, ordered X-rays of Plaintiff's ankle, which were taken on site. The radiologist's findings included "a mildly displaced, oblique fracture of the distal fibula," "widening of the medial joint space," and "soft tissue swelling." *Id*. at 6.

Defendant Bates diagnosed Plaintiff's ankle fracture, placed Plaintiff's ankle in a splint, and provided Plaintiff with crutches. Defendant Bates ordered "a ortho RFS [request for service] because of the widened mortise," and "explained to the patient that he will likely have surgery because of an unstable joint and he understands." *Id*. at 103. Defendant Bates explained the risk of a surgical procedure to Plaintiff, confirmed that Plaintiff is not allergic to lidocaine, and received Plaintiff's informed written consent to a surgical procedure. *Id*. Defendant Bates ordered additional pain medication, splint checks by the nursing staff on a weekly basis, and a follow-up in five days with a primary

---

[1] These material facts are taken from Defendants' Separate Statement of Undisputed Material Facts; Defendants' exhibits, including certified and authenticated copies of Plaintiff's pertinent medical records; Plaintiff's Separate Statement of facts; and the declarations and exhibits submitted by Plaintiff in support of his opposition to Defendants' motion for summary judgment. Where a material fact is in dispute, it will be so noted. Facts that are immaterial for purposes of resolving the current motion are not included in this recitation.

[2] Citations to electronically filed documents refer to the pagination assigned by the CM/ECF system.

care physician. *Id*. At approximately 5:00 p.m., Plaintiff was released and returned to his cell, properly using the crutches provided to him.

The following day, November 6, 2014, nursing staff performed the splint check, as ordered by Defendant Bates. On November 7, 2014, Plaintiff submitted an urgent Health Care Services Request Form ("CDC 7362" form). Plaintiff indicated that he had a lot of pain and could not access his upper bunk, and requested a "green vest" to identify him as exempt from the "yard-down" policy, i.e., getting down on the ground during alarms. *Id*. at 96. Nursing staff received Plaintiff's request form the next day, on November 8, 2014. That same day, Defendant Dr. Faruk examined Plaintiff. Defendant Faruk noted that Plaintiff was taking medication three times per day for pain control, and reported feeling pain at a level 5 on a scale of 0 to 10. Defendant Faruk also noted that "the provider has written a Request for Service (RFS) for Orthopedic consultation, which was met by InterQual criteria, but the approval is still pending." *Id*. at 100. In response to Plaintiff's specific requests, Defendant Faruk ordered a mobility vest and lower bunk status. Defendant Faruk confirmed that the orthopedic surgery consultation remained pending.

On November 10, 2014, a reviewing official approved Defendant Faruk's accommodation orders for Plaintiff to continue using crutches, transfer to a lower bunk, and receive a mobility vest. *See id*. at 157. On that same date, Plaintiff was examined by nursing staff. Plaintiff reported feeling pain at a level 9 on a scale of 0 to 10, and Defendant Dr. Garikaparthi prescribed a new pain medication, Tylenol 3. *See id*. at 97; 111. On November 13, 2014, Defendant Garikaparthi examined Plaintiff during a follow-up appointment. Plaintiff indicated that he had "a problem with ambulating with the crutches," and Defendant Garikaparthi advised "temporary wheelchair placement for 2 weeks." *Id*. at 93. Defendant Garikaparthi also upgraded the Orthopedic Request for Service from routine to "urgent," after noting Plaintiff's continued pain and swelling due to his injury. *Id*.

Sometime after seeing Defendant Garikaparthi, Plaintiff submitted a Health Care

Services Request,[3] indicating that the Tylenol 3 pain medication was making him "feel sick, and vomiting also." *Id*. at 91. Plaintiff's request was received and reviewed by triage nursing staff on November 15, 2014, who noted that Plaintiff was using a wheelchair for mobility, and that Plaintiff was "awaiting ortho consult." *Id*. Plaintiff's Tylenol 3 prescription was discontinued, and Defendant Garikaparthi prescribed methadone as a pain reliever. The new prescription was transmitted to the pharmacy on November 17, 2014. The following night, on November 18, 2014, nursing staff consulted a physician via telephone after Plaintiff complained of feeling "itchy" after taking the prescribed amount of methadone. *Id*. at 88. Plaintiff was diagnosed with an allergic reaction to methadone. The next day, Plaintiff was examined by nursing staff, who consulted with the primary care provider. Defendant Garikaparthi discontinued Plaintiff's methadone prescription, and prescribed 800 milligrams of ibuprofen three times daily in order to relieve Plaintiff's pain. *Id*. at 113. Defendant Garikaparthi also ordered Plaintiff to be housed in a barrier-free, wheelchair accessible ground floor cell, and extended Defendant Faruk's previous order for a bottom bunk assignment. The accommodations were approved that same day. *See id*. at 155.

On November 23, 2014, nursing staff referred Plaintiff for examination by a physician after Plaintiff failed to take 50% of his prescribed medications. Later that day, Defendant Faruk examined Plaintiff. In response to Plaintiff's complaint of pain, Defendant Faruk administered 30 milligrams of Toradol intra-muscularly. *See id*. at 83. Defendant Faruk ordered follow-up X-rays of Plaintiff's ankle, which were taken that same day and showed the fracture in Plaintiff's ankle as healing, but still visible. *See id*. at 7. Defendant Faruk confirmed that Plaintiff's orthopedic consultation was scheduled for the following day.

---

[3] The Health Care Services Request form is undated.

On November 24, 2014, Dr. Roman Cham, an orthopedic surgeon, held a consultation regarding Plaintiff's ankle fracture. *See id*. at 139. After reviewing the X-rays of Plaintiff's ankle, Dr. Cham determined that surgery was necessary, recommended an open reduction and internal fixation procedure, and submitted an urgent request for the surgery. Defendant Bates approved the request that same day, and marked the request "urgent" as instructed by Dr. Cham. In his notes, Dr. Cham indicated that "hopefully, we will be able to get the patient on the schedule early next week." *Id*. at 139. The surgery was scheduled for the following Friday, December 5, 2014. *See id*. at 1309.

On November 26, 2014, Defendant Nurse Lawhorn met with Plaintiff, and reviewed the orthopedic consultation notes with him. She also ordered a refill of Plaintiff's ibuprofen prescription. *See id.* at 114. On December 1, 2014, Defendant Garikaparthi ordered a series of preoperative chest X-rays and lab tests in order to medically clear Plaintiff for surgery. That same day, Plaintiff submitted a Health Care Services Request form, indicating he was feeling pain due to his broken ankle. *See id*. at 78. Nursing staff received and reviewed the request that same day. The following day, Plaintiff received medical clearance and was so advised by Defendant Lawhorn. Plaintiff reported feeling pain at a level 5 on a scale of 0 to 10. *See id*. at 79. On December 4, 2014, nursing staff met with Plaintiff to prepare him for surgery. Defendant Lawhorn examined Plaintiff, confirmed he was cleared for surgery, and communicated the information to Dr. Cham. *See id*. at 76.

On December 5, 2014, Plaintiff was admitted to Alvarado Hospital, and Dr. Cham performed the open reduction and internal fixation procedure. Plaintiff "tolerated the procedure well. There were no intraoperative complications." *Id*. at 128. Plaintiff was discharged with a prescription for Percocet for pain relief every three hours as needed. *See id.* at 134.

On December 7, 2014, nursing staff examined Plaintiff, who reported feeling pain at a level 10 on a scale of 0 to 10. The nursing staff referred Plaintiff to the primary care

provider on duty, Defendant Dr. Maletz. Defendant Maletz administered 60 milligrams of Toradol intra-muscularly, and prescribed a new pain medication. *See id*. at 73. The following day, Plaintiff submitted a Health Care Services Request form indicating an urgent need for pain medication due to "level 10 pain." *Id*. at 67. Nursing staff received and reviewed the request that same day and prescribed 15 milligrams of morphine, to be taken twice daily for five days as needed. *Id*. at 116. Plaintiff was examined by nursing staff almost every day post-operatively. Dr. Cham conducted a follow-up consultation with Plaintiff on December 24, 2014. That same day, Defendant Maletz noted Dr. Cham's observations and recommendations, and ordered follow-up consultations with Dr. Cham and a primary care provider. *Id.* at 226.

Plaintiff continued to receive post-operative care and physical therapy from non-defendant medical personnel at RJD for months following his surgery. Periodic X-rays and an MRI with contrast showed that Plaintiff's ankle was healing properly. *See id*. at 8-13. On April 12, 2016, X-rays of Plaintiff's ankle showed that the fracture was healed. *See id.* at 13.

Based on these events, Plaintiff brings an Eighth Amendment claim for inadequate medical care against Defendants Bates, Faruk, Garikaparthi, Lawhorn, and Maletz.[4] Plaintiff seeks injunctive relief in the form of "proper and undelayed [sic] medical treatment to his right ankle injury." *Id*. ¶ 157.

//

---

[4] In his moving papers, Plaintiff refers to one of his post-operative treating physicians, Dr. Jin Yu, as a defendant in this action. *See, e.g.*, Doc. No. 87 (Response Brief) at 10. However, Dr. Yu is not named as a defendant in Plaintiff's amended complaint. In addition, Plaintiff asserts repeatedly that Defendants were negligent in their provision of medical care following his ankle injury. *See, e.g.*, Doc. No. 87 (Separate Statement) ¶¶ 18, 19, 24, 49, 55. However, Plaintiff does not raise a state law negligence cause of action in his amended complaint. Because a party must be properly named and served with the summons and operative complaint, and defendants must be given "fair notice" of the claims against them and the grounds for relief, Plaintiff may not add new parties or new claims in opposition to a summary judgment motion. *Pickern v. Pier I Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006).

# DISCUSSION

Defendants move for summary judgment, arguing that the undisputed facts demonstrate that they did not act with deliberate indifference to Plaintiff's serious medical need. Plaintiff contends that genuine issues of fact exist regarding whether Defendants violated his Eighth Amendment rights when they purportedly misdiagnosed Plaintiff's injury, denied and delayed appropriate accommodations, delayed his treatment and surgery, and denied Plaintiff adequate pain relief.

### *1. Legal Standard*

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of establishing the basis of its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if it could affect the outcome of the suit under applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248.

The party opposing summary judgment cannot "rest upon the mere allegations or denials of [its] pleading but must instead produce evidence that sets forth specific facts showing that there is a genuine issue for trial." *Estate of Tucker v. Interscope Records*, 515 F.3d 1019, 1030 (9th Cir.), cert. denied, 555 U.S. 827 (2008) (internal quotation marks omitted). In applying the standard set forth under Rule 56, district courts must "construe liberally motion papers and pleadings filed by *pro se* inmates and . . . avoid applying summary judgment rules strictly." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010).

### 2. Eighth Amendment Claim

Prisons must provide medical care for their prisoners. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Failure to do so can amount to an Eighth Amendment violation under 42 U.S.C. § 1983. *Id.* at 105. To succeed on an Eighth Amendment claim for deficient medical care, a plaintiff must show "deliberate indifference" to his or her "serious medical needs." *Id.* at 104. This includes "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012) (*overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014).

To satisfy the objective standard, a plaintiff must prove the existence of a serious medical need. *Estelle*, 429 U.S. at 104. A serious medical need exists whenever failure to provide treatment "could result in further significant injury" or cause "the unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled in part on other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, (9th Cir. 1997) (en banc)) (internal quotation marks omitted). "Indications that a plaintiff has a serious medical need include 'the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'" *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting *McGuckin*, 974 F.2d at 1059-60).

The Ninth Circuit has summarized the requirements for establishing the subjective element of an Eighth Amendment claim for inadequate medical care:

> A prison official is deliberately indifferent under the subjective element of the test only if the official knows of and disregards an excessive risk to inmate health and safety. This requires more than ordinary lack of due care. The official must both be aware of facts from which the inference could be drawn

> that a substantial risk of serious harm exists, and he must also draw the inference. Deliberate indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care. In deciding whether there has been deliberate indifference to an inmate's serious medical needs, we need not defer to the judgment of prison doctors or administrators.

*Colwell*, 763 F.3d at 1066 (internal quotations, alterations, and citations omitted). Importantly, in order to establish that a defendant acted with deliberate indifference, a plaintiff must show more than misdiagnosis, medical malpractice, or even gross negligence. *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).

In this case, there is no dispute that Plaintiff suffered a serious injury to his right ankle on November 5, 2014. There is also no dispute that Defendants knew about Plaintiff's injury. The controversy in this case revolves around the manner in which Defendants treated Plaintiff. Specifically, Plaintiff alleges that Defendants misdiagnosed his injury, denied and delayed the provision of appropriate treatment, including surgery, denied his requested accommodations, and denied him adequate pain relief. Plaintiff also argues that Defendants knew of, and disregarded, the serious risk of complications due to Plaintiff's chronic diabetes. Even viewed in the light most favorable to Plaintiff, the evidence does not bear out his claims. Plaintiff's conclusory allegations to the contrary are insufficient to raise a triable issue of fact. *See Marks v. United States*, 578 F.2d 261, 263 (9th Cir. 1978) ("Conclusory allegations unsupported by factual data will not create a triable issue of fact.") (citation omitted).

As an initial matter, none of the defendants in this action misdiagnosed Plaintiff's ankle injury. Plaintiff's contemporaneous medical records, summarized in detail above, clearly reflect that Defendant Bates recognized the seriousness of Plaintiff's injury, ordered X-rays, and upon review, concurred with the radiologist's finding that Plaintiff had suffered a fracture. Subsequently, each medical professional who examined Plaintiff was aware of this diagnosis and treated Plaintiff accordingly. After correctly diagnosing

Plaintiff's fracture, Defendant Bates immediately treated the condition by stabilizing the ankle with a splint, ordering weekly splint checks, providing Plaintiff with crutches, and ordered an orthopedic consult due to the extent of the injury. "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)). Plaintiff has not raised a genuine issue of fact as to either issue.

Likewise, Plaintiff's disagreement with Defendants' various decisions regarding pain medication fails to establish deliberate indifference. *See Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (holding "[a] difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim"). A defendant's purposeful failure "to respond to a prisoner's pain or possible medical need," may be sufficient under certain circumstances to constitute deliberate indifference. *May v. Baldwin*, 109 F.3d 557, 566 (9th Cir. 1997) (internal quotation marks omitted). However, the undisputed evidence in this case establishes that Defendants responded promptly on every documented occasion that Plaintiff complained of pain, or requested a different type of pain medication. Subsequent to Plaintiff's injury and surgery, Defendants prescribed and/or administered no less than six different types of pain relievers, including narcotics, according to Plaintiff's reported level of pain and the onset of any negative side effects. Plaintiff's medical records also demonstrate that each health care provider was aware of his chronic conditions, including diabetes, and took these conditions into consideration when altering Plaintiff's prescriptions.

Plaintiff's complaints regarding the failure to provide necessary accommodations are also not borne out by the evidence. For example, Defendant Bates immediately provided Plaintiff with crutches. Even if Plaintiff requested a wheelchair, Plaintiff has

not submitted any evidence to demonstrate that the provision of crutches in lieu of a wheelchair was medically unacceptable at that juncture. Moreover, within three days of sustaining his injury, Defendant Faruk granted Plaintiff's requests for further accommodations and ordered a mobility vest and lower bunk assignment. One week after surgery, Defendant Garikaparthi granted Plaintiff's request for wheelchair placement and issued corresponding orders. Defendants provided orders for each of Plaintiff's requested accommodations. Defendants are not liable for other prison officials' failure to carry out those orders as quickly as Plaintiff would have preferred, or as quickly as necessary given Plaintiff's condition.

Finally, Plaintiff's most serious allegation involves the thirty days that passed between the date of his injury and the date of his surgery. The delay was noted by Dr. Cham, the orthopedic surgeon. Plaintiff argues that Defendants acted with deliberate indifference by delaying the surgery. However, there is no evidence in the record to suggest that Defendants acted in any way to delay Plaintiff's surgery. Defendant Bates immediately ordered an orthopedic consult. The records reflect that Defendants were aware of the Request for Service, and appear to have diligently monitored its progress. For example, within one week of Plaintiff's injury, during which he received splint care and pain management on an almost daily basis, Defendant Garikaparthi upgraded the request to urgent. Defendant Faruk confirmed the scheduling of the consultation, which was held less than three weeks post-injury. Plaintiff's surgery was scheduled the following week. In the intervening period, Defendants Faruk and Garikaparthi ordered follow-up X-rays of Plaintiff's ankle, which showed that the ankle had been stabilized and the fracture had not worsened.

In sum, no reasonable jury could find that Defendants acted with the type of deliberate indifference that satisfies the subjective standard of Plaintiff's Eighth

Amendment claim.[5] Plaintiff's medical records establish that Defendants did not misdiagnose Plaintiff's injury. Defendants worked to manage Plaintiff's pain, altered his prescriptions when requested and as necessary, and ordered all of Plaintiff's requested accommodations and extended the time periods for those accommodations as necessary. Defendants submitted the request for an orthopedic consult, upgraded the urgency of the request based on Plaintiff's level of pain and rate of healing, prepared and medically cleared Plaintiff for surgery, and managed his post-operative care. As such, there is no genuine dispute of material fact suitable for trial, and summary judgment in favor of Defendants is appropriate.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendants' motion for summary judgment. The Clerk of Court is instructed to enter judgment accordingly, terminate any pending motions, deadlines, or hearings, and close the case.

**IT IS SO ORDERED**.

DATE: January 17, 2019

HON. MICHAEL M. ANELLO
United States District Judge

---

[5] Defendants also argue that, even if there are triable issues of fact as to Plaintiff's Eighth Amendment claim, they are entitled to qualified immunity from suit. Because the Court finds that no constitutional violation occurred, "there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (overruled in part by *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (overruling *Saucier*'s requirement that the two prongs of the qualified immunity analysis be decided sequentially)).